# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 21-00157-01-CR-W-HFS |
| ) | |
| DAMON SHYRON BLY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant Damon Shyron Bly's Motion to Dismiss Based on Post-Indictment Delay (Doc. #13). Defendant Bly argues that the Government "violated his Sixth Amendment rights by failing to arrest him for over 20 months after indicting him." (Doc. #13 at 2.) For the reasons set forth below, it is recommended that this motion be denied.

## I. INTRODUCTION

On June 24, 2021, the Grand Jury returned a nine-count Indictment charging Defendant Bly with one count of conspiracy to distribute heroin (Count One), and eight counts of distribution of heroin (Counts Two–Nine). (Doc. #1.) The Grand Jury also returned a forfeiture allegation related to the conduct charged in Count One. (Doc. #1.)

An evidentiary hearing was held on May 23, 2023. Defendant Bly was represented by appointed counsel, Assistant Federal Public Defender Carie Allen. The Government was represented by Assistant United States Attorney Gregg R. Coonrod. The Government called six witnesses: Special Agent Jacob Woodley with the Drug Enforcement Administration (DEA); Deputy U.S. Marshal Michael Stokes; Deputy U.S. Marshal Brandon Redetzke; Deputy U.S. Marshal Aaron Riley; Deputy U.S. Marshal Shaun Holbrook; and Deputy U.S. Marshal Daley

Bornsztejn. Witnesses called by the defense were Ashley Plowmen and Deborah Littlejohn. Defendant's Exhibits #1, Bly's Presentence Sentence Investigation report from an earlier federal court case, and Defendant's #2, Missouri Department of Revenue records, were admitted into evidence.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Upon the return of a Grand Jury indictment, the DEA utilizes all efforts within the first ten days to identify, locate, and arrest an individual. (Tr. at 3-4.) If after that ten-day period runs and the defendant has not been apprehended, the DEA delegates all apprehension methods to the U.S. Marshals Service. (Tr. at 4, 6.) After the delegation of apprehension to the Marshals Service, the DEA continues to conduct case status checks to see if there has been an attempt at a border crossing, whether the warrant remains active, and also works with the Assistant United States Attorney (AUSA) to determine whether the AUSA would like to continue the delegation to the Marshals Service. (Tr. at 5.)

2. Once the DEA delegates the matter to the Marshals Service, a deputy marshal from the enforcement squad is assigned to the case to initiate a fugitive investigation. (Tr. at 9-10.) During the investigation, the deputy marshal deconflicts "the subject to see if anybody else is interested in them, looking at them, deconflicting addresses where we might find them." (Tr. at 10.) The deconflicting process looks to see if "there are any other agencies that are currently having any other open investigations or older investigations on the subject." (Tr. at 31.) The deputy also speaks with the

2

Case 4:21-cr-00157-HFS   Document 26   Filed 07/05/23   Page 2 of 15

investigator/case agent who sought the indictment to obtain information that might be relevant. (Tr. at 10-11.) Additionally, the deputy conducts several checks in local police databases, the Department of Revenue driver's license database, and various commercial databases containing credit and utilities data. (Tr. at 11, 15.) The deputy also looks for tax and employment information. (Tr. at 11.) The enforcement squad, consisting of approximately six deputies at any given time, often has deputies who rotate out of the squad on a regular basis. (Tr. at 10, 12, 15.) Therefore, when a deputy is rotating off the enforcement squad the deputy will confer with the new deputy who is taking over the old deputy's caseload and discuss each case. (Tr. at 12-13.) In some instances, the deputy may generate a report to document the investigative activities. (Tr. at 13.) From July 15, 2021, to March 1, 2023, which correlates with the time frame of the warrant in this matter, the Marshals Service arrested 863 fugitives. (Tr. at 14.) Deputy marshals do not usually go up to a house and knock on the door of a defendant who has an active warrant because they would lose the tactical advantage of the defendant not knowing that law enforcement was looking for him and potentially having the defendant not return to that house. (Tr. at 23, 24, 33, 39, 50.) Only when there is a tactical team would deputy marshal knock on someone's door. (Tr. at 23.) Additionally, deputies do not talk with family members of wanted subjects, especially when there is a secret indictment, because they would lose the tactical advantage. (Tr. at 35.)

3. After the sealed indictment against Defendant Bly was returned on June 24, 2021, DEA agents looked at the information gathered through the investigation to determine Defendant Bly's known associations with other individuals and known addresses. (Tr. at 3, 4, 7.) The only information obtained from that inquiry was a known address on

3

South Benton Avenue in Kansas City, Missouri, but agents could not locate Defendant Bly. (Tr. at 4.) On approximately July 15, 2021, the DEA delegated all apprehension efforts to the Marshals Service. (Tr. at 4-5.) Nevertheless, the DEA continued efforts in this matter and a case status report was generated on October 18, 2021, which indicated that DEA agents checked with the El Paso Intelligence Center (EPIC) to determine if there were any border crossings and with the National Crime Information Center (NCIC) to determine if there was updated information and to determine if the warrant was still active. (Tr. at 5-6.) Neither search resulted in any additional information but confirmed that the warrant for Defendant Bly was still active. (Tr. at 6, 8.)

4. There were four or five deputy marshals that worked on the arrest warrant regarding Defendant Bly. (Tr. at 15.) Deputy Brandon Redetzke was first assigned to the warrant. (Tr. at 17.) After being assigned the warrant on July 15, 2021, Deputy Redetzke deconflicted the warrant and determined that DEA Special Agent Kline originally had the warrant. (Tr. at 17-18, 26.) After contacting Special Agent Kline, Deputy Redetzke learned that the last time DEA had seen Defendant Bly was at an address on South Benton and that DEA believed Defendant Bly was dealing drugs in that area. (Tr. at 18.) Special Agent Kline also informed Deputy Redetzke that that area is a high-trafficking area and an area that is "very police surveillance savvy." (Tr. at 18, 24.) On several occasions when DEA set up surveillance on Defendant Bly, DEA agents were spotted by other individuals on the block. (Tr. at 18.) Additionally, several people on the block had taken the house numbers off the houses so police could not tell specific addresses. (Tr. at 18-19.) Deputy Redetzke then conducted various database checks on Defendant Bly, including: CLEAR, which provides information on basic tax records, addresses, vehicles,

4

and bills; Accurint, which is similar to the CLEAR database; NCIC; and REJIS. (Tr. at 19-20, 26.) All of those databases reported an address on Indiana Avenue, which was Defendant Bly's mother's address. (Tr. at 27, 28.) Deputy Redetzke ran the utilities for the address on South Benton, but records for that address were not associated with Defendant Bly. (Tr. at 20.) Deputy Redetzke was familiar with Defendant Bly as Deputy Redetzke had arrested Defendant Bly at the Indiana Avenue address in the past on a supervised release violation. (Tr. at 21, 28.) Along with another deputy, Deputy Redetzke then began conducting surveillance of the areas associated with Defendant Bly using covert vehicles. (Tr. at 21, 28.) In attempting to surveille the South Benton address, Deputy Redetzke often parked a covert vehicle on the block, but was spotted by other people on the block every time. (Tr. at 22.) Individuals on the block would come up to the police car or point at the car and laugh, walk away, and get on cell phones, which indicated that they were spreading the word that police were on the block. (Tr. at 22.) Even when conducting surveillance from a couple of blocks away using telescopic equipment, Deputy Redetzke never saw movement at the South Benton address and would be spotted by other individuals on the block. (Tr. at 25, 27, 28.) After being spotted, Deputy Redetzke left the area as staying would have been futile. (Tr. at 23.) At no time did Deputy Redetzke knock on the door at the address on South Benton because doing so "would have ruined the tactical advantage of [Defendant Bly] not knowing that we were looking for him." (Tr. at 23.) In addition to losing the tactical advantage, Deputy Redetzke was concerned about weapons because Special Agent Kline had informed Deputy Redetzke that in 2019, Defendant Bly was in a car chase with DEA and had thrown a pistol out the window. (Tr. at 23.) Deputy Redetzke also surveilled other

5

addresses, including 4337 Indiana, but never saw any movement at any of those addresses. (Tr. at 24.) The Indiana Avenue address block was not as surveillance savvy as the one on South Benton. (Tr. at 28.) Deputy Redetzke also conducted drive-by surveillance of those addresses multiple times a day, at different times of the day but again never saw any movement. (Tr. at 24, 28.) Most of Deputy Redetzke's surveillance was of the South Benton address. (Tr. at 27.)

5. Deputy Redetzke handed off the warrant to Deputy Aaron Riley in December of 2021. (Tr. at 25, 30.) The two deputies spoke about the case and what information had been learned, and then Deputy Riley went through the deconfliction process again and ran Defendant Bly's name through various databases. (Tr. at 31.) Having obtained some addresses to start looking for Defendant Bly, Deputy Riley then began conducting surveillance at those locations, which included addresses on South Benton, Indiana Avenue, and one on Van Brunt. (Tr. at 32.) Because Deputy Riley had received information that Defendant Bly and his associates were surveillance savvy, so Deputy Riley set up surveillance blocks away. (Tr. at 32.) Deputy Riley had the case for approximately six months and despite surveilling the locations multiple times, never had any results with the surveillance. (Tr. at 32-33.) He surveilled the Indiana Avenue address approximately five to ten times throughout the six-month period he had the case and would sit for approximately two to three hours each time. (Tr. at 34-35, 36.) Deputy Riley never had contact with Defendant Bly's mother. (Tr. at 35.)

6. Deputy Riley than handed the warrant over to Deputy Shaun Holbrook in July of 2022. (Tr. at 33, 37.) Deputy Holbrook spoke with Deputy Riley about the case and was informed of the above information and Deputy Holbrook also went through the

6

Case 4:21-cr-00157-HFS   Document 26   Filed 07/05/23   Page 6 of 15

deconfliction process and running Defendant Bly's name through the various databases. (Tr. at 37-38, 40, 42.) No new information turned up during that process. (Tr. at 38.) Deputy Holbrook had no information that Defendant Bly was involved in the counter-surveillance. (Tr. at 40-41.) Deputy Holbrook did not conduct any surveillance or drive-bys during this six-month period because earlier attempts had not been fruitful. (Tr. at 41, 42.)

7. Deputy Holbrook turned the case over to Deputy Daley Bornsztejn on March 2, 2023. (Tr. at 41, 44.) Deputy Bornsztejn was fairly new and was therefore working with Deputy Scott Hill. (Tr. at 43.) Like the other deputies, Deputy Bornsztejn deconflicted the case and ran Defendant Bly's name through various databases. (Tr. at 44.) Deputy Bornsztejn also talked to the other deputies and learned that the South Benton block was very surveillance savvy. (Tr. at 44.) On March 6, 2023, Deputy Bornsztejn and Deputy Hill conducted surveillance in the 3900 block of South Benton for about an hour, but with negative results. (Tr. at 44, 45.) Deputy Bornsztejn and Deputy Hill then conducted surveillance at the Indiana Avenue address. (Tr. at 45.) Shortly after the deputies conducted surveillance, a confidential source informed Deputy Hill that Defendant Bly may be working at Flowers Baking Company in Lenexa. (Tr. at 45.) Later that day on March 6, 2023, Deputy Bornsztejn and Deputy Hill went to the Flowers Baking Company and met with the Human Resources Manager who informed the deputies that Defendant Bly was an active employee that had just recently started working for the company. (Tr. at 46.) The deputies coordinated a good time with the manager in which to arrest Defendant Bly. (Tr. at 46.) Defendant Bly was taken into custody at the baking company on March 8, 2023, without incident. (Tr. at 46, 53.) After the arrest, Deputy Bornsztejn

7

learned that Defendant Bly began working at the baking company on January 8, 2023, and on his application had listed two other previous employments. (Tr. at 47.) Deputy Bornsztejn followed up with one of the other employers and learned that Defendant Bly had applied to work there but had never actually physically worked there. (Tr. at 48.) Another deputy conducted database checks to see if Defendant Bly had any wage or benefits within Kansas or Missouri in the last 18 months and had negative results. (Tr. at 48.) Deputy Bornsztejn also spoke with a police officer from the Kansas City, Missouri Police Department who had been working the nightshift in the neighborhood area (South Benton and Indiana Avenue (Tr. 44-45)) in November of 2021, was familiar with Defendant Bly, and who knew there was an active warrant for his arrest. (Tr. at 49.) The police officer told Deputy Bornsztejn that had she seen Bly she would have arrested him. (Tr. at 49.)

8. Ashley Plowden, an investigator with the Federal Public Defender's Office, ran a database check on Defendant Bly in March of 2023, to see how hard it would be to find Defendant Bly. (Tr. at 55.) Ms. Plowden first ran a check on Accurint which revealed the address on Indiana Avenue as the most current address, but also listed other addresses. (Tr. at 55.) Ms. Plowden then contacted Defendant Bly's mother, Deborah Littlejohn and asked where Defendant Bly resided and was told that the Indiana Avenue address, where Ms. Littlejohn resided, was his permanent address. (Tr. at 55-56.) Ms. Plowden also looked up Defendant Bly's Department of Revenue records, which included address information for non-driver's license identification, listing addresses on either South Benton or Indiana Avenue from August of 2016 to the present. (Tr. at 56; Def. Ex. #2.) Five of the I.D.s listed the Indiana Avenue address and were issued in August 2016,

8

October 2021, December 2022, May 2022, and January 2023, while one I.D. listed the South Benton address and was issued in March of 2018. (Tr. at 56-58; Def. Ex. 2.) The Federal Public Defender had represented Defendant Bly in a previous case and a Presentence Report dated November 21, 2008, listed the Indiana Avenue address as Defendant Bly's address. (Tr. at 59.) Ms. Plowden also called Probation and Parole, and was informed that Defendant Bly had been supervised at the Indiana Avenue address. (Tr. at 59-60.)

9. Deborah Littlejohn, Defendant Bly's mother, has lived at the Indiana Avenue address since 2010, and before that her mother and her mother's husband had lived at that address for about 43 years. (Tr. at 61-62.) Defendant Bly lived with his grandmother at the Indiana Avenue address and stayed with his mother on 53rd and Booth. (Tr. at 62.) Between when he was released from prison and his arrest in March of 2023, Defendant Bly lived at the Indiana Avenue address. (Tr. at 63.) Occasionally he would stay at other places but never permanently moved to other places. (Tr. at 63-64.) During the time period he was released from prison and before Defendant Bly's March 2023 arrest, Ms. Littlejohn was never contacted by law enforcement, and she never saw law enforcement surveilling her address. (Tr. at 64.)

### III. DISCUSSION

Defendant Bly argues that the Government violated his Sixth Amendment rights by failing to arrest him for over 20 months after indicting him. (Doc. #13 at 2.) The Government argues that the presumption of prejudice in this matter has been rebutted as the Government worked diligently to bring Defendant Bly into custody and there is no prejudice to Defendant Bly. (Doc. #14.)

The Sixth Amendment provides that a defendant in a criminal proceeding has a right to a speedy trial. U.S. Const. amend. VI. The United States Supreme Court has found that "the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial." *Dickey v. Fla.*, 398 U.S. 30, 38, 90 S.Ct. 1564, 1569 (1970). "[T]he Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." *United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002). In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, courts deploy a balancing test, taking into consideration the length of the delay, "the reason the government assigns to justify the delay," defendant's assertion of his right to a speedy trial, and any prejudice incurred by the defendant due to the delay. *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192 (1972). The balancing test "must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id.* at 533.

A. Length of Delay

The first factor, length of delay, is a two-part inquiry. First, to "trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *United States v. DeGarmo*, 450 F.3d 360, 364-65 (8th Cir. 2006) (internal quotations and cite omitted). If the delay is found to be presumptively prejudicial, the next inquiry is to what extent the "delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 2691 (1992). "This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*

The duration between Defendant Bly's indictment and his arrest was 20 months and 12 days. Such a delay is presumptively prejudicial. *Doggett*, *id.* at 652 n.1 (finding that the threshold for finding presumptive prejudice is generally about a year). Nevertheless, the "delay is not . . . so inordinately lengthy that it requires an automatic dismissal." *Smith v. Mabry*, 564 F.2d 249, 251 (8th Cir. 1977) (cataloguing cases by length of delay). The Eighth Circuit has repeatedly found that similar delays were not sufficient to trigger an automatic dismissal. *United States v. Cooley*, 63 F.4th 1173, 1178 (8th Cir. 2023) (29-month delay was not an "extraordinary delay"); *United States v. Mallett*, 751 F.3d 907, 914 (8th Cir. 2014) (delay of 16 months); *cf. United States v. Saguto*, 929 F.3d 519, 524 (8th Cir. 2019) (22-month delay weighs in favor of the defendant, but ultimately there was no violation of the defendant's Sixth Amendment right); *United States v. Jeanetta*, 533 F.3d 651, 656 (8th Cir. 2008) (15-month delay weighs in defendant's favor but in the end no violation of defendant's Sixth Amendment right). The delay of 20 months and 12 days in the instant matter is significant but not egregious. Therefore, this factor weighs in favor of Defendant Bly.

Defendant Bly also states that "the post-indictment delay is compounded by the fact that the [G]overnment waited 21 months to indict Mr. Bly on the charges in the first place." (Doc. # 13 at 3.) Defendant Bly does not cite any cases supporting his assertion that the pre-indictment delay prejudiced him, nor does he provide evidence as to how the pre-indictment delay prejudiced him, although as noted by Defendant Bly, he had not yet received discovery prior to filing the instant motion.[1] The Court notes that Defendant Bly has not fully argued that his due process rights were violated by the pre-indictment delay, and has therefore not shown reasons for the delay or actual prejudice. *See United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 2051-52 (1977)

---

[1] Defendant Bly filed the instant motion eight days after his arrest in this matter.

(holding "that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."). Therefore, while the Court acknowledges that there was a delay between the dates of some of the incidents and the indictment, the Court finds that Defendant Bly has waived this argument and will not analyze whether the pre-indictment delay resulted in a due process violation. To the extent that there was pre-indictment delay in addition to post-indictment delay, the Court recognizes such but does not find that it alters the analysis much with regard to length of delay. While there are counts that include distribution dates of early 2019, there is also a conspiracy count which dates from January of 2019 through June 24, 2021. Therefore, the length of delay still weighs in favor of Defendant Bly.

    B.  <u>Reasons for the Delay</u>

In analyzing the second factor, the reasons for the delay, courts "evaluate 'whether the government or the criminal defendant is more to blame[,]' … [according] 'different weights … to different reasons.'" *United States v. Erenas-Luna*, 560 F.3d 772, 777 (8th Cir. 2009) (quoting *Doggett*, 505 U.S. at 651, and *Vermont v. Brillon*, 556 U.S. 81, 90, 129 S.Ct. 1283, 1290 (2009). Intentional delay on the part of the Government is weighed "heavily against the Government, whereas mere negligence on the part of the Government is a "considerable factor" but is weighed "less heavily." *Erenas-Luna*, 560 F. 3d at 777. Delay "caused by the defense" is weighed "against the defendant." *Id.*

In this instance there is "no evidence that the Government intentionally caused any delay or filed pretrial motions to cause delay in order to gain a tactical advantage." *United States v. Shepard*, 462 F.3d 847, 864 (8th Cir. 2006). To the contrary, multiple witnesses testified that they worked diligently to try to find the defendant. Deputy marshals regularly checked various

12

databases to determine if new information had been obtained as to Defendant Bly's whereabouts. Additionally, except for approximately eight months, deputies conducted surveillance or drove by the area for signs of Defendant Bly. The eight months where no surveillance took place occurred after multiple deputies attempted to conduct surveillance for over a year with no luck and were often stymied by activity in one of the neighborhoods. It was not until a tip came in that indicated that Defendant Bly had recently started working that the deputies were able to ascertain Defendant Bly's location. The Government was, therefore, diligent in its efforts to locate Defendant Bly and there is no indication of negligence in this matter.

Defendant Bly argues that the Indiana Avenue address was a known address for Defendant Bly and/or his family, yet none of the deputies attempted to contact anyone at that address to locate Defendant Bly. As the deputies testified, doing so would have resulted in them losing the tactical advantage and would have tipped off Defendant Bly that law enforcement was looking for him. Under these circumstances, the decision not to contact anyone at that address was understandable and reasonable.

Because the Government worked diligently to locate Defendant Bly, this factor cannot weigh against them. Nor does it weigh against Defendant Bly as the Court has not received any evidence that Defendant Bly was personally involved in the counter-intelligence or somehow knew of the warrant and took steps to avoid law enforcement. Therefore, this factor is essentially neutral.

### C. Assertion of Speedy Trial Rights

The third factor under the *Baker* analysis is whether the defendant asserted his right to a speedy trial and is "closely related to" the two previous factors. *Baker*, 407 U.S. at 531. A "defendant's assertion of his speedy trial right … is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531-32. However, where

13

a defendant is unaware of an indictment prior to his arrest, his "failure to assert his right to a speedy trial … cannot be weighed against him." *United States v. Richards*, 707 F.2d 995, 997 (8th Cir. 1983). Therefore, this factor is similarly neutral.

    D. <u>Prejudice</u>

Finally, the fourth factor analyzes to what extent the defendant suffered prejudice associated with the delay. This factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect[, such as]: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The third factor, impairment to the defense case, is the most serious as it has the potential to skew "the fairness of the entire system." *Doggett*, 505 U.S. at 654. "A showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant; however, [w]here the government has been negligent … prejudice can be presumed if there has been an excessive delay." *Erenas-Luna*, 560 F.3d at 778-79.

Because this motion was filed shortly after Defendant Bly was arrested, there has been no oppressive pretrial incarceration and Defendant Bly has not had to endure anxiety and concern related to the criminal matter. Therefore, it is only the third factor at issue in this matter. Defendant Bly, however, has not pointed to any specific impairment in his defense. As discussed in *Erenas-Luna*, actual prejudice is required where the Government was reasonably diligent in its efforts. *Id.* Because there has been no showing of actual prejudice, this factor weighs against Defendant Bly.

## IV. <u>CONCLUSION</u>

The delay in this matter was not so egregious that automatic dismissal is warranted. Applying the *Barker* factors results in a finding that the length of delay should be held against the

14

Case 4:21-cr-00157-HFS   Document 26   Filed 07/05/23   Page 14 of 15

Government, but law enforcement in this matter worked diligently to secure Defendant Bly and Defendant Bly has not shown any actual prejudice. Therefore, this Court recommends a finding that the presumption of prejudice has been rebutted and there has been no Sixth Amendment violation.

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant Damon Shyron Bly's Motion to Dismiss Based on Post-Indictment Delay (Doc. #13).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest justice.

          */s/ Lajuana M. Counts*
          LAJUANA M. COUNTS
          UNITED STATES MAGISTRATE JUDGE